MEGAN L. HAYES, Wyo. Bar # 6-2891
Attorney at Law
910 Kearney Street
Laramie, WY 82070
Telephone: 307-760-6258

Attorney for Roy Mestas

---

### IN THE UNITED STATES DISTRICT COURT, DISTRICT OF WYOMING

---

| | | |
|---|---|---|
| ROY MESTAS | ) | CASE NO. 17-CV-00017-NDF |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| TOWN OF EVANSVILLE, a duly incorporated | ) | |
| Municipal Corporation under the laws of the | ) | |
| State of Wyoming, | ) | |
| | ) | |
| Defendant. | ) | |

### PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT'S
### MOTION FOR SUMMARY JUDGMENT

Plaintiff Roy Mestas, by and through undersigned counsel, submits this brief in

opposition to Defendant Town of Evansville's motion for summary judgment. By including only

selected portions of the plaintiff's deposition and discovery responses, the Town has provided

this Court with a sanitized and incomplete picture of the hostile work environment and retaliation

inflicted on Mr. Mestas by his supervisor, Dale Brown.  As demonstrated below, there are

significant issues of disputed material fact regarding the pervasiveness of the harassment and the

adverse employment actions taken by Supervisor Brown against Mr. Mestas that preclude entry

of a summary judgment on any of Mr. Mestas's three discrimination claims.  Therefore, the

Court should deny the Town's motion.

I.    **Disputed and undisputed facts relevant to the Plaintiff's Title VII and ADA discrimination claims.**

**The following facts in this paragraph are undisputed**:  Mr. Mestas started working as a sanitation truck driver for the Town of Evansville on September 24, 2012.  According to the Town of Evansville's Employee Handbook, Mr. Mestas was to serve a six-month probationary period as an at-will employee.  Declaration of Roy Mestas, ¶ 1, attached hereto as Exhibit A and Employee Handbook, attached thereto as Exhibit 1.  His job location was the Public Works maintenance garage, which is in a physically separate location from the Evansville Town Hall.  The Town Hall houses the municipal offices and is approximately six blocks from the Public Works maintenance garage.  Mestas Decl., ¶ 2.  Mr. Mestas was injured at work on November 24, 2012 and took medical leave to recover from that injury until January 14, 2013, when he was able to return to work with no restrictions. On the day he returned to work, his co-supervisor, Dale Brown, informed him that he was extending Mr. Mestas's six-month probationary period through May 24, 2013, "because of the extended lost work time due to your injury on November 26, 2012." Mestas Decl., ¶¶ 3 and 6 and Memo from Boettcher and Brown to Mestas, attached thereto as Exhibit 2.

**The following facts are disputed, unless specifically noted otherwise**:  When Supervisor Brown presented Mr. Mestas with the memo extending his probationary period, Brown told Mr. Mestas that he would 'have to let him go' if he did not sign the document. Feeling threatened by this demand, Mr. Mestas signed the document, thereby acknowledging his agreement to its non-negotiable terms.  Mestas Decl. ¶ 7.  From then until Supervisor Brown fired him three months later, Brown subjected Mr. Mestas to harsh and condescending treatment more frequently and more severely than other employees. For example, Supervisor Brown

expected Mr. Mestas to complete tasks without the assistance of co-workers, which was highly

unusual in the small Public Works department. Mestas Decl., ¶¶ 8-9; Deposition of Eric Reyna,

pp. 11-13, attached hereto as Exhibit B (describing multiple situations when public works

employees would help each other with job-related tasks).   Supervisor Brown never issued a

Town radio to Mr. Mestas so when he was driving his sanitation truck and needed assistance, he

used his personal cell phone to call Dale Brown's Town-issued cell phone to request help.  Mr.

Mestas's calls and phone messages to Brown requesting help always went unanswered.   Mestas

Decl., ¶ 10. *See also* Reyna Depo., p. 28(Brown did not let Mr. Mestas have a radio and when

Mestas called for help, Brown got upset and told Reyna "Don't help him.  He don't need help.").

Supervisor Brown instructed co-workers not to assist Mr. Mestas and reprimanded those co-

workers who did so. On one occasion, a large three-yard capacity trash bin fell into the back of

Mr. Mestas's sanitation truck.  This happens periodically and takes two or three employees to

remove a trash bin of that size. Supervisor Brown told Mr. Mestas's co-employees, Ron Emond,

Dan Adcock and Eric Reyna, not to help him and to let Mr. Mestas do it himself. Mestas Decl.,

¶¶ 11-12.  *See also* Reyna Depo., pp. 31-32 (describing incident and Supervisor Brown's

instructions to let Mr. Mestas do it himself); Deposition of Ron Emond, pp. 18-19, attached

hereto as Exhibit C (describing incident and Supervisor Brown's instructions to "Let him do it

himself"); Deposition of Dan Adcock, pp. 54-56, attached hereto as Exhibit D (describing

incident and Supervisor Brown's instructions to Mr. Mestas to get up on the truck and hook up

the bin by himself, even though it was evident to everyone that Mestas was afraid of heights).

Supervisor Brown was also hostile and condescending to Mr. Mestas during weekly meetings

with other public works employees, which was humiliating to Mr. Mestas.  Mestas Decl., ¶ 15.

Because of Supervisor Brown's hostile treatment, Mr. Mestas began to write down and record some of his conversations with Brown, to document Brown's conduct and Mr. Mestas's efforts to stop the harassment. Mestas Decl., ¶ 16. In one audio recording on or about February 21, 2013,[1] Mr. Mestas sought out Supervisor Brown privately in an attempt to understand what he could to do stop Brown's abusive treatment, as demonstrated by his opening words to Brown:

> Well, I – I don't know if I've done something to piss you off or something. And I – I – man, I enjoy my job. I love it here. I – *I seem to upset you quite a bit, and I don't mean to*.

(Emphasis added). Mestas Decl., ¶ 17, and transcript of recorded conversation, attached thereto as Exhibit 3, p. 4. Supervisor Brown responded that "Well, I don't appreciate people arguing with me." He then proceeded to tell Mr. Mestas that he was 'still frustrated with your back,' and that although he knew Mr. Mestas had not injured his back intentionally, Mr. Mestas was not "bedridden" when he was out on "disability" for his back injury and that he should have come to work anyway to perform administrative light-duty work. Transc., pp. 4-5.[2] Brown accused Mr. Mestas of using his injury to call in sick twice after returning from medical leave. Supervisor Brown told him that, "I have people outside of our department asking me, 'Is this a pattern?,'" insinuating that Mr. Mestas was trying to get out of work. Transc., pp. 6-7. Supervisor Brown explained that someone working for the Town of Evansville outside of the Public Works department, "on other authority," had told him that he should terminate Mr. Mestas's employment if Mr. Mestas could not perform his job duties. Transc., p. 7. These comments indicated that Supervisor Brown had discussed Mr. Mestas's continued employment with other Town officials and were intimidating to Mr. Mestas. Mestas Decl., ¶ 21. Supervisor Brown also

---

[1]Supervisor Brown confirmed his voice in the recording. Deposition of Dale Brown, p. 48, attached hereto as Exhibit E.

[2]It is undisputed that Mr. Mestas had provided documentation from his physician that he was unable to work "until further notice." Defendant's Answer, ¶ 13.

accused Mr. Mestas of being argumentative. Transc., pp. 4, 10, and 13-14.  Mr. Mestas apologized profusely, multiple times, and explained that he never intended to be argumentative. Mr. Mestas told Brown that in the future, he should tell Mr. Mestas if he's being argumentative and to stop.  Transc., p. 4. At no time after this conversation did Mr. Brown ever tell Mr. Mestas that he was being argumentative. Mestas Decl., ¶ 22.  *See also* Brown Depo., p.133 (could not recall whether he had asked Mestas not to argue with him at any time after this conversation).

During this conversation, Supervisor Brown never suggested that Mr. Mestas should or could file a grievance, contact the mayor or any other Town official, or contact anyone at the Town Hall with his concerns.  Mr. Mestas believed, based on that conversation, that if he got injured or sick one more time, Brown would fire him.  Mestas Decl., ¶ 21. And although Mr. Mestas had tried to address the hostile work environment directly with his supervisor, Brown's harassment continued unabated. After that conversation, Mr. Mestas would frequently come home upset and complain to his wife that Supervisor Brown called him stupid beaner, was condescending, would not get Mr. Mestas any help when he requested it, and instructed co-workers not to help him and if they did, Brown would reprimand them.  Mestas Decl., ¶ 25; Deposition of Roy Mestas, p. 21, lines 12-17, attached hereto as Exhibit F.

Throughout his employment and particularly after he returned from medical leave in mid-January of 2013, Mr. Mestas heard Supervisor Brown use the words "stupid beaner," "dumb Mexican," "beaner," and make other derogatory comments about "Mexicans" and other minority groups on multiple occasions, usually in the Public Works maintenance garage office and often in the presence of other Public Works department employees.  These were general derogatory comments, references and jokes about Hispanics.  In addition, before and sometimes during weekly morning safety meetings and in the presence of other Public Works employees,

Supervisor Brown and other employees would joke about Hispanics or other ethnic and racial minority groups.  Emond Depo., pp. 26-27.  Mr. Mestas personally heard Brown make derogatory comments about Hispanics on at least six occasions, if not more.  Mestas Decl., ¶¶ 26-28.

Mr. Mestas kept a memo pad in his shirt pocket in which he documented job-related information, such as addresses where trash bins needed to be repaired, where trash bins had not been set out, or where extra trash had been left on the ground next to the trash bins. On February 22, 2013[3] and again on or about March 27, 2013, Mr. Mestas documented in his memo pad that Supervisor Brown had made a "stupid beaner" remark. Mestas Decl., ¶¶ 29-30, and Exhibit 4 thereto, Bates No. Mestas Employment, 000037. On at least two separate occasions, Mr. Mestas complained directly to Supervisor Brown that his derogatory comments about Hispanics were offensive.  Mestas Decl., ¶ 31. Mr. Mestas documented one of those occasions in his memo pad as follows: "Asked Dale to stop using Beaner remarks!!! 4-1-13."  Mestas Decl., ¶ 32, and Exhibit 4 thereto, Bates No. Mestas Employment, 000038. Supervisor Brown responded by stating that his (Brown's) wife is a "Mexican" and he says stuff like that to her all the time. Mestas Decl., ¶ 33.

After Mr. Mestas complained to him about his derogatory comments, Supervisor Brown never suggested to Mr. Mestas that he could or should file a grievance, contact the mayor or any other elected Town official, or contact anyone at the Town Hall with his concerns.  Mestas Decl., ¶ 34.  **It is undisputed** that the Town of Evansville had no procedure for employees to make complaints of harassment, other than for sexual harassment.  Mestas Decl., Exhibit 1, pp. 33-36. **It is undisputed** that the Town only had a general grievance procedure that did not mention

---

[3] This was approximately one day after the recorded conversation described above, p. 4.

workplace harassment or discrimination.  The grievance procedure was expressly limited to use only by permanent employees, not probationary employees like Mr. Mestas. Mestas Decl., ¶¶ 35-37, and Town of Evansville Employee Handbook, Grievance Procedure, pp. 59-62. The Town of Evansville's grievance procedure provided that "[i]f a **permanent employee** has a grievance or wishes to complain, every effort should be made to resolve the problem by informal means at the lowest possible level, i.e., discussing the problem with the department head." Mestas Decl., Exhibit 1, p. 59 (emphasis added).

Three of Mr. Mestas's co-workers corroborated his hostile work environment and retaliation allegations against Supervisor Brown. Eric Reyna, the only other Hispanic employee in the Public Works department, testified that Supervisor Brown would make comments to him such as "not bad for a Mexican," comments that Mr. Reyna would relay to Mr. Mestas.  Reyna Depo., p. 36.  Mr. Reyna also described another incident when Brown had made a derogatory comment to Mr. Reyna and Mr. Mestas about Mexicans for which Brown later apologized privately to Mr. Reyna. Mr. Reyna recalled the incident as "pretty upsetting."  Reyna, Depo., p. 37.  Mr. Reyna explained that he told Mr. Mestas that Supervisor Brown had called him (Reyna) to apologize for the derogatory comment:

> . . . the reason why I mentioned it to Roy was because it was said in the presence of both of us.  And I remember looking at Roy, and he was upset about it, through his facial expressions.  And I wasn't too happy about it either.  First thing in the morning, something you don't want to hear.  And so I did let him know that, yeah, Dale had apologized to me to see if maybe he received an apology as well.

Reyna Depo., pp. 37-38. *See also* Mestas Deposition, Exhibit F hereto, p. 127 (when Reyna and Mestas were going out on a job together, Brown told them, "I don't need you beaners going together."). Reyna also testified that both he and Mr. Mestas were in Brown's presence when

Brown used terms like "beaner" and "Mexican," recalling two specific times when Mr. Mestas was not happy about it. Reyna Depo., p. 38, lines 19-20, and p. 39. Finally, Mr. Reyna recalled Supervisor Brown using the term "beaner" one morning in the crew room in the presence of Mr. Mestas and other employees. Mr. Reyna never complained directly to Dale Brown or the Town's mayor about Brown because he was afraid of losing his job and the likelihood that "there would be repercussions in some way." Reyna Depo., pp. 24-25, 44. Mr. Reyna knew that Mayor Hinds and Mr. Brown were close friends and Brown led employees to believe that Mayor Hinds would always defend Brown, so complaining would be futile and likely to provoke retaliation from Brown. Reyna Depo., pp. 24-25, 44.

Ron Emond testified that he heard Supervisor Brown refer to Mr. Mestas as a "stupid beaner" sometime after Mr. Mestas had returned from medical leave. He also testified that he heard Brown refer to someone as a "beaner" in a joking manner and that he heard jokes at work that weren't only about "beaners." Emond Depo., pp. 26-27. Dan Adcock testified that has heard Brown use the term "beaner" "many times." He also heard Brown refer to his wife that way and that Brown once referred to an electrician as "Beaner Electric." Adcock Depo., p. 25.

Messrs. Reyna, Emond, and Adcock all testified that after Mr. Mestas returned from medical leave, Supervisor Brown treated him much more harshly than before his leave, including that Brown "was odious toward him." Reyna Depo., pp. 10-12 and 28 (after Mr. Mestas got injured, Brown "targeted" Mr. Mestas, "singled him out" and was "odious towards him"). Ron Emond testified that Supervisor Brown 'beat up on [Mestas] pretty good' and that Brown told Emond that he would make Mestas's "life so miserable that he would quit." Emond Depo., pp. 18 and 21. Emond testified that Supervisor Brown "was always on [Mestas's] case with

whatever he did after he came back from the injury.  Dale was pissed because he got hurt, plain and simple and that's it in a nutshell."  Emond Depo., p. 48, lines 19-22.  Dan Adcock testified that Supervisor Brown treated Mr. Mestas differently after Mestas returned from injury leave, specifically that Brown's treatment "progressively became worse.  I'm not positive the injury was the cause of it, but it certainly helped verify Dale's feelings that Roy wasn't going to work there anymore.  So he just kept pushing even harder, as we talked about, with [sic] put him in positions to – very difficult to be successful, that sort of thing."  Adcock Depo., p. 21, lines 8-13; *see also* pp. 8-11 (Adcock providing multiple examples of Dale Brown giving Mestas extra work after his injury so that he could not be successful in his job). Emond also testified that Supervisor Brown had yelled at him and Dan Adcock when they completed one of Mr. Mestas's work orders.  Mr. Emond testified that he and Mr. Adcock weren't that busy so they delivered a trash bin as requested in the work order.  When they returned Supervisor Brown "stopped and yelled at us for doing his [Mestas's] job," which Mr. Emond found unusual and was something for which he had never been reprimanded before.  Emond Depo, p. 23.  Dan Adcock testified that Supervisor Brown told Mr. Mestas to complete a certain task by noon.  Adcock knew that would be difficult to accomplish, so he did it himself and later was reprimanded for it by Brown, yet another example of how Brown made it impossible for Mr. Mestas to be successful in his job. Adcock Depo, pp. 21-22.

All three employees testified that they got along fine with Mr. Mestas, believed he was a hard worker who kept his sanitation truck clean and well maintained, had no complaints and heard no complaints from other employees about his job performance, never noticed that he would disappear from the job site, were never asked by Brown where Mestas was, and felt Mr. Mestas was a "team player" who assisted them with job-related tasks when needed, as was the

custom and practice in their department.  Adcock Depo., p. 4; Emond Depo., pp. 13-14, 21;

Reyna Depo., pp. 3-4, 9, 30-32. They all recalled being told by Supervisor Brown not to help Mr.

Mestas, including the incident when Brown made Mr. Mestas remove, by himself, the large

three-yard dumpster that had fallen into his sanitation truck, described on page 3 above.

In early April of 2013, Mr. Mestas reinjured his back while performing his job duties.

Mestas Decl., ¶¶ 38-39.  He never complained to Brown about his back pain and never filed an

injury report because he was worried he would be fired by Dale Brown.  Mestas Decl., ¶ 40.

Instead, he contacted his physician to schedule a steroid injection to relieve his back pain.  He

was concerned he would be fired if he could not perform his job duties so he continued to work

and performed all essential functions of his job.  Mestas Decl., ¶ 41.

In another recorded conversation on April 11, 2013, Mr. Mestas informed Supervisor

Brown that he would need one day off on April 18, 2013, because "they're going to do an

injection in my back where that – that – remember I was talking to you about it a while back?

They wanted to do one today, but I told them I couldn't because I need a driver and stuff because

of medicine they give you, I can't drive. . . . " Mr. Mestas explained that "I won't miss any work,

only than the – the day for the – the injection.  You want me to write it on the calendar?"  Mestas

Decl., ¶ 42 and Transcript of April 11, 2013 recorded conversation, attached thereto as Exhibit 5.

Supervisor Brown granted his request for time off of work for the injection and agreed that Mr.

Mestas should put it on the Public Works department calendar. Mestas Decl., ¶ 43.[4]

On snow days, most Public Works department employees were supposed to report to

work by 7 a.m., to shovel snow at Town facilities. On Monday, April 15, 2013, Mr. Mestas

---

[4]Supervisor Brown confirmed his voice in the recording.  Brown Depo., pp. 117-18.

reported early to work to assist with snow removal.  On that day, the Casper area was experiencing a late spring storm with heavy, wet snow. While shoveling snow, Mr. Mestas asked Supervisor Brown if he could use his own snow blower because of his back pain.  Mr. Mestas's house is only a few short blocks from the location where he was shoveling snow. Supervisor Brown denied Mr. Mestas's request for a snow blower and said, 'that's what I have Mexicans for, to do this work,' or words to that effect.  Mestas Decl, ¶¶ 44-47.  Mr. Mestas completed his snow shoveling duties that day, which contributed significantly to his back pain. Mestas Decl, ¶ 48. *See also* Emond Depo., p. 25 (recalling that Mr. Mestas asked to use his snow blower to shovel snow because his back was sore and Dale Brown refused and required Mr. Mestas to complete the shoveling with the rest of the crew). On April 16, 2013, the Casper area continued to get wet, heavy snowfall.  Mr. Mestas called into work that morning to ask Supervisor Brown if he could be excused from shoveling snow because he had reinjured his back.  Supervisor Brown hung up on him.  When he called back, Supervisor Brown told him he did not 'want to hear my shit.'  Mestas Decl., ¶ 49.

**The following facts in this paragraph are undisputed:** On April 17, 2013, Supervisor Brown terminated Mr. Mestas's employment because things 'were not working out.'  He told Mr. Mestas to 'go take care of your back and whatever . . . .'  Mestas Decl., ¶ 50.  After his termination, Mr. Mestas applied for Social Security Disability Insurance (SSDI) benefits.  In his application for benefits, Mr. Mestas stated that as of April 16, 2013, he had multiple impairments, including his back injury of November 26, 2012 for which he was to undergo surgery in June of 2013, that prevented him from engaging in any substantial gainful activity. Mestas Decl, ¶ 51. He began receiving SSDI benefits based on his inability to engage in any substantial gainful activity as of April 16, 2013. Mestas Decl, ¶ 52.

Mr. Mestas may have been able to continue working beyond April 17, 2013, if Supervisor Brown had accommodated him by excusing him from shoveling snow or had responded to his repeated requests for assistance from co-workers.  However, after reinjuring his back and being required to shovel snow on April 15, 2013, his back pain worsened significantly. Mestas Decl, ¶ 53.  Mr. Mestas ultimately underwent two surgeries for his back injury and reached maximum medical improvement in May of 2014. He returned to the workforce in December of 2014. Mestas Decl, ¶ 54.

Dale Brown categorically denied Mr. Mestas's allegations of harassment and retaliation. He testified that he only used the term "beaner" once in the workplace and that was in Eric Reyna's presence. Brown Depo., pp. 124-26, 169. He testified that he never used the term "beaner" or "stupid beaner" in Mr. Mestas's presence or at work and that Mr. Mestas never asked him to stop using beaner remarks.  Brown Depo., pp. 130-31.  He denied ever referring to his wife using that term and ever referring to his wife as a beaner in Dan Adcock's presence. Brown Depo., p. 127.  He denied telling co-workers not to assist Mr. Mestas and had no recollection of the incident when he required Mr. Mestas get a three-yard trash bin out of his sanitation truck alone.  Brown Depo., p. 135-36.  He denied telling Ron Emond that he would make Mr. Mestas's life so miserable that he would quit.  Brown Depo., p. 64.  He testified that he was not always "politically correct" and that employees would tell ethnic jokes and he didn't stop them, which is not "PC." Brown Depo., pp. 128-29.  He denied ever treating Mr. Mestas in an odious manner, after having that word comprehensively defined for him.  Brown Depo., pp. 134-35.

Supervisor Brown testified that one older employee, Wilbur Yankey, did only "limited" shoveling on snow days, even though he did not have a note from his doctor that excused him from shoveling snow.  Brown described the department's snow shoveling duties as follows:

> There's a multitude of different tasks that we do from shoveling to sometimes we could use a snowblower – or, not a snowblower – a leaf blower if it's fine and powdery. Sometimes we used the John Deere tractor with the snow blade on it.  Not everything is just dyed in the wool.  Circumstance dictates what procedures we would use on a given time, heavy wet snow, light powdery snow, snowblower, shovels, brooms.

Brown Depo., pp. 115-116.  Despite not having a fixed "dyed in the wool" routine, he did not engage in any interactive process with Mr. Mestas after Mr. Mestas asked to use a snow blower because of back pain.[5]  Supervisor Brown testified that he would only have excused Mr. Mestas from shoveling snow if Mestas had a medical excuse.  Brown Depo., p. 117.

Brown further denied treating Mr. Mestas harshly at all or instructing co-employees not to help him. Instead, he claimed that after returning from medical leave, Mr. Mestas lacked initiative, was argumentative, was slow in his job duties and full of excuses, never had time to assist co-workers, and had problems "interfacing" with co-employees because of "antisocial" tendencies.  Brown Depo., pp. 64, 133-34. Supervisor Brown also claimed that Mr. Mestas would disappear from the job site and when asked by Brown, no other employee knew his whereabouts. Brown Depo., pp. 69-72.  Supervisor Brown could not recall which employees had issues with Mr. Mestas, could not recall which employees he asked about Mestas's whereabouts, and generally could not fathom Mr. Mestas's discrimination claims. He testified that he did not even know that Mestas was Hispanic, despite his complexion and surname.  Brown Depo., p.

---

[5] *See* 29 C.F.R. 1630.2(o)(3) (describing the "interactive process" for employers to engage in with an employee who requests a reasonable accommodation for a disability).

170, lines 6-7.  Supervisor Brown never claimed to have terminated Mr. Mestas's employment because of physical limitations in performing his job duties.

I.   **Summary judgment on Mr. Mestas's Title VII and ADA claims is not appropriate because there are disputed issues of material fact regarding the pervasiveness of the harassment and the adverse employment actions taken by Supervisor Brown against Mr. Mestas that should be decided by the jury.**

The Town argues that it is entitled to a summary judgment on Mr. Mestas's Title VII hostile work environment claim because Brown made only isolated comments and the racial harassment was not sufficiently pervasive. It further contends that there is no evidence that Mr. Mestas's discharge on April 17, 2013 was related to Mr. Mestas's complaint on April 1, 2013, when he asked Brown to 'stop with the beaner remarks.'  The Town argues that Mr. Mestas's ADA hostile work environment claim should be dismissed because he is not a qualified individual within the meaning of the ADA because he returned to work in January 2013 with no work restrictions.  Finally, the Town seeks summary judgment on the ADA retaliation claim because there was no adverse job action and terminating Mr. Mestas five and ½ months after he was injured is too remote to constitute retaliation.  As demonstrated below, these arguments fail to address disputed facts and are without merit. The Town's motion should be denied.

A.  **Standard for Summary Judgment.**

Summary judgment is only appropriate when "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c). At summary judgment, the court must view the evidence and draw reasonable inferences therefrom in the light most favorable to the nonmoving party.  *Herrera v. Lufkin Industries, Inc.*, 474 F.3d 675, 680 (10th Cir. 2007).

**B. Summary judgment should be denied on the Plaintiff's Title VII and ADA hostile work environment claims because there are disputed issues of material fact regarding the pervasiveness of the hostile and abusive conduct.**

A claim of harassment on the basis of disability proceeds largely in the same manner as a claim of hostile environment harassment based on any other protected category under Title VII. *Lanman v. Johnson Co., Kansas*, 393 F.3d 1151, 1155 (10th Cir. 2004) (hostile work environment claims are actionable under the ADA); *Anthony v. City of Clinton*, 1999 WL 390927, at *3 (10th Cir. June 15, 1999). "'Title VII forbids employment discrimination on the basis of race or national origin,'" including hostile work environment discrimination based on one's protected class. *Herrera*, 474 F.3d 675, 680 (10th Cir. 2007) (quoting *Chavez v. New Mexico*, 397 F.3d 826, 831 (10th Cir. 2005) and citing 42 U.S.C. § 2000-2(a)(1)).[6] To survive summary judgment on a hostile work environment claim based on race or disability, a plaintiff "'must show that a rational jury could find that the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment,'" and that the victim "'was targeted for harassment because of [his] ... race[ ] or national origin.'" *Id.* (quoting *Sandoval v. City of Boulder*, 388 F.3d 1312, 1326-27 (10th Cir. 2004). *See also Anthony*, 1999 WL 390927, at *3 (discussing elements of an ADA disability harassment claim and quoting *Penry v. Fed. Home Loan Bank of Topeka*, 155 F.3d 1257, 1261 (10th Cir. 1998) (discussing elements of a Title VII sexual harassment claim based on a hostile work environment theory)). The "'severity and pervasiveness evaluation is particularly unsuited for summary judgment

---

[6]An ADA hostile work environment claim requires the plaintiff to prove he is in the protected class, i.e., that he is disabled within the meaning of the ADA, qualified with or without reasonable accommodation, and was discriminated against because of his disability. *McKenzie v. Dovala*, 242 F.3d 967, 969 (10th Cir. 2001); *Aldrich v. Boeing Co.*, 146 F.3d 1265, 1269 (10th Cir. 1998). Mr. Mestas's partial summary judgment motion seeks to establish that he has a record of a disability.

because it is quintessentially a question of fact.'"  *Id*. (quoting *McCowan v. All Star Maintenance, Inc.*, 273 F.3d 917, 923 (10th Cir. 2001) (footnote omitted) and *O'Shea v. Yellow Tech. Services, Inc.*, 185 F.3d 1093, 1098 (10th Cir. 1999).

Whether the environment constituted a racially- or disability-based hostile work environment is determined by looking at the totality of the circumstances, including "'"the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Faragher v. City of Boca Raton*, 524 U.S. 775, 787-88 (1998) (quoting *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 23 (1993)). A plaintiff must demonstrate that the work environment was objectively and subjectively offensive, but need "not demonstrate psychological harm, nor is she required to show that her work suffered as a result of the harassment." *Penry*, 155 F.3d at 1261 (citing *Davis v. U.S. Postal Serv.*, 142 F.3d 1334, 1341 (10th Cir. 1998).

Mr. Mestas's allegations of racial insults, jokes and slurs are even more pervasive than those set forth in *Herrera v. Lufkin Industries, Inc.*, 474 F.3d 675 (10th Cir. 2007), where the Court reversed entry of a summary judgment for the employer. There, the court reviewed the plaintiff's four-year employment history in Wyoming and found that Mr. Herrera had set forth five specific, discreet examples of discriminatory comments by his supervisor, who was located in Texas. The court also found that other racially-neutral harassment, such as condescending and harsh treatment and comments made to other employees that were **occasionally** shared with the plaintiff, such as referring to the plaintiff as "the Mexican" and "the fucking Mexican," presented a "close call" as to the pervasiveness of the harassment. 474 F.3d at 678-79 and 691-92, Judge Cassell dissenting.  But viewing the evidence in the light most favorable to the plaintiff, the court

concluded that Mr. Herrera had "asserted sufficient evidence from which a jury could find that his work environment was racially hostile. In particular, he has submitted sufficient evidence indicating that his workplace was pervasively discriminatory." *Herrera*, 474 F.3d at 680. The court reasoned that "'[f]acially neutral abusive conduct can support a finding of [racial] animus sufficient to sustain a hostile work environment claim when that conduct is viewed in the context of other, overtly [racially]-discriminatory conduct.'" *Herrera*, 474 F.3d at 682, n.7 (quoting *Chavez*, 397 F.3d at 833) (addressing sexual harassment claim)[7]:

> This is because what is important in a hostile environment claim is the *environment,* and [racially]-neutral harassment makes up an important part of the relevant work environment. Conduct that appears [racially]-neutral in isolation may in fact be [race]-based, but may appear so only when viewed in the context of other [race]-based behavior. Thus, when a plaintiff introduces evidence of both [race]-based and [race]-neutral harassment, and when a jury, viewing the evidence in context, reasonably could view all of the allegedly harassing conduct ... as the product of [racial] hostility, then it is for the fact finder to decide whether such an inference should be drawn. *Id.* (quotations, citation omitted); *see also McCowan,* 273 F.3d at 925–26; *O'Shea v. Yellow Tech. Servs., Inc.,* 185 F.3d 1093, 1097, 1102 (10th Cir.1999). Further, the totality of the circumstances analysis in cases like the one before us obviates what would otherwise be the court's call in deciding how many racist comments constitute harassment or whether general profanity and vulgarity mixed with specific racial, ethnic, or sexual epithets equate to the sum of pervasiveness required .... Rather, by framing the evidence on *summary judgment* within the context of this particular workplace, we eliminate the suggestion that a certain number of comments is or is not actionable ... and leave the resolution to the trier of fact. *McCowan,* 273 F.3d at 926.

Viewing the facts in the light most favorable to Mr. Mestas, he has submitted sufficient evidence that his workplace was pervasively discriminatory. Mr. Mestas was employed for less than six months, during which time he was qualified to and did perform his job until April 16, 2013. During his employment, Supervisor Brown called him a "beaner," a "stupid beaner," and repeatedly referred to him as a "Mexican." Supervisor Brown subjected him to offensive jokes and disability-based hostile treatment, including making his life miserable, being condescending,

---

[7]In *Chavez*, the court determined that two comments made a supervisor, in which he said the plaintiff was a member of a "clica," were not sufficiently pervasive to withstand entry of a summary judgment. 397 F.3d 826, 832.

isolating him from fellow employees, requiring him to complete tasks without assistance, and always finding fault with his work.  Co-workers testified that Brown's harassment intensified after Mr. Mestas returned from injury leave. They gave specific examples of Brown's hostile and retaliatory treatment. Mr. Brown extended Mr. Mestas's probationary, at-will status immediately after his return from injury leave and threatened to 'let him go' if he did not agree to prolong his at-will status.  Mr. Mestas remembered vividly and wrote down specific dates when Supervisor Brown had used racial epithets and when he told Brown to "stop with the Beaner remarks." That was April 1, 2013, just 16 days prior to his termination.  Two days before he was fired and shortly after telling Brown he would need an injection in his back, Supervisor Brown refused his request for an accommodation for his back pain, specifically to use a snow blower.  Brown told him 'that's why I have Mexicans, to do this work."

Indisputably, Mr. Mestas felt intimidated and threatened by Supervisor Brown's conduct, described by Eric Reyna as "odious."  Mr. Mestas attempted to address the harassment directly with Supervisor Brown, as documented in the April 1, 2013 entry in his memo pad and the recorded conversation in February of 2013. Those efforts only engendered more hostility, particularly when Supervisor Brown claimed he would fire Mestas if he could not perform his job duties and insinuated that he and others considered that taking two days of sick leave equated to a "pattern" of avoiding work.  Mr. Mestas believed these statements to be evidence of the precariousness of his continued employment. Mr. Mestas never complained to Brown about reinjuring his back or his recurring back pain, for fear he would be fired.  Mr. Mestas's fears were realized when Brown fired him immediately following his first complaints of back pain.

It is the jury's responsibility to resolve, given the totality of the circumstances, how many racist, race-neutral, and disability-based comments constitute harassment and whether Brown's

hostile, harsh treatment mixed with his specific racial epithets was motivated by race or disability and was sufficiently pervasive to be actionable under Title VII and the ADA.  Mr. Mestas was fired just two short two weeks after telling Dale Brown to stop with the "beaner" comments.  His termination is an adverse employment action for purposes of his Title VII hostile work environment claim, as is Brown's extending Mr. Mestas's probation immediately after returning from injury leave.  That extension of his at-will status is also an adverse employment action for purposes of his ADA hostile work environment claim.[8] The Town had no complaint procedure for national origin- or disability-based discrimination and its general grievance procedure was available only to permanent, not probationary employees like Mr. Mestas.  Supervisor Brown never offered any preventive or corrective opportunities after Mr. Mestas complained directly to him about his racist comments and his hostile, angry behavior.  For these reasons, this case is particularly ill-suited for summary judgment on Mr. Mestas's Title VII and ADA hostile work environment claims.  He he has submitted sufficient evidence of a pervasively discriminatory workplace and adverse employment actions taken against him by Dale Brown that should be resolved by a jury.

---

[8]When an employee suffers a tangible employment action resulting from a direct supervisor's harassment, the employer is strictly liable.  *Burlington Indus. Inc. v. Ellerth*, 524 U.S. 742, 765 (1998); *Faragher*, 524 U.S. at 807-08.  No affirmative defense is available to the employer in those cases.  In the absence of a tangible employment action, the employer may interpose an affirmative defense to defeat liability by proving (a) that the employer exercised reasonable care to prevent and correct promptly any discriminatory conduct, and (b) the plaintiff unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to otherwise avoid harm.  *Faragher*, 524 U.S. at 807-08; *Ellerth*, 524 U.S. at 764-65; *Vance v. Ball State University*, 133 S. Ct. 2434 (2013).

**C. There is sufficient evidence of retaliation and adverse employment actions to present Mr. Mestas's ADA retaliation claim to a jury.**

The ADA's retaliation statute provides in pertinent part as follows: "It shall be unlawful to coerce, intimidate, threaten, or interfere with *any individual* in the exercise or enjoyment of, *or on account of his or her having exercised or enjoyed*, . . . any right granted or protected by this chapter." 42 U.S.C. § 12203(b) (emphasis added).  To prosecute an ADA retaliation claim, "'a plaintiff need not show that []he suffers from an actual disability.'"  *Foster v. Mountain Coal Co., LLC*, 830 F.3d 1178, 1186 (10th Cir. 2016) ("By its own terms, the ADA retaliation provision protects 'any individual' who has opposed any act or practice made unlawful by the ADA . . . .") (quoting 42 U.S.C. § 12203(a)).

To establish retaliation in violation of the ADA, a plaintiff must prove that:

1. he engaged in conduct protected under the ADA;
2. he was subjected to an adverse employment action after the protected conduct occurred;
3. the defendant retaliated against him because of his conduct protected by the ADA.

*Foster*, 830 F.3d 1178, 1187 (quoting *Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1178 (10th Cir. 1999).  In short, a plaintiff is subjected to an adverse employment action because of his participation in protected activity if the adverse employment action would not have occurred but for that participation.

As argued in his brief in support of his motion for partial summary judgment, conduct protected under the ADA includes medical leave to receive treatment for or to recover from an injury. *Foster*, 830 F.3d 1178, 1187; *Cisneros v. Wilson*, 226 F.3d 1113, 1129 (10th Cir. 2000); *Smith v. Difee Ford-Lincoln-Mercury, Inc.*, 298 F.3d 955, 967 (10th Cir. 2002); *Rascon v. U.S. West Communications, Inc.*, 143 F.3d 1324, 1333-34 (10th Cir. 1998); *Hudson v. MCI Telecommunications Corp.*, 87 F.3d 1167, 1169 (10th Cir. 1996)); *Taylor v. Pepsi-Cola Co.*, 196

F.3d 1106, 1110 (10th Cir. 1999). An adverse employment action in the context of a retaliation

claim need not materially affect the terms and conditions of employment so long as a reasonable

employee would have found the action materially adverse, which means it might have

"dissuaded a reasonable worker from making or supporting a charge of discrimination," or

engaging in any other conduct protected by the ADA. *See Burlington N. & Santa Fe Ry. Co. v.*

*White*, 548 U.S. 53, 68 (2006); *see also Thompson v. N. Am. Stainless, LP*, 562 U.S. 170 (2011)

(applying *Burlington* standard). Here, Mr. Mestas must show that he was subjected to an adverse

employment action because he took medical leave protected by the ADA.

The Tenth Circuit "liberally defines the phrase 'adverse employment action,'" and takes a

"case-by-case approach in determining whether a given employment action is 'adverse.'"

*Anderson v. Coors*, 181 F.3d 1171, 1178 (10th Cir. 1999) (quoting *Jeffries v. Kansas*, 147 F.3d

1220, 1232 (10th Cir. 1998). A materially adverse employment action includes scrutinizing work

more closely than that of other employees, without justification, and abusive verbal behavior that

is reasonably likely to deter protected activity, even if it is not sufficiently "severe or pervasive"

to create a hostile work environment. EEOC Enforcement Guidance on Retaliation and Related

Issues, August 25, 2016, p. 36. Retaliatory harassing conduct can also constitute a materially

adverse employment action, even if it is not severe or pervasive enough to alter the terms and

conditions of employment. *Id.* at 41 (citing *Martinelli v. Penn Millers Ins. Co.*, 269 F. App'x

226, 230 (3d Cir. 2008) (ruling that after *Burlington Northern*, an employee claiming "retaliation

by workplace harassment" is "no longer required to show that the harassment was severe or

pervasive"); *EEOC v. Chrysler Grp., LLC*, WL 693642 at *8-11 (E.D. Wis. 2011) (holding that

reasonable jury could conclude employees were subjected to unlawful retaliation under

*Burlington Northern* standard when human resources supervisor verbally harassed them by

screaming and pounding his fists on the table while threatening termination if they filed grievances)).

The Tenth Circuit has determined that direct evidence that retaliation played a part in the employment decision is satisfied when an employee complains about unlawful discrimination to a supervisor, thereby engaging in protected opposition to an unlawful employment practice under the ADA, and the employee is terminated shortly after making the complaint.  *Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1179 (the closer an adverse employment action is to the protected activity, the more likely it will support a showing of causation). *See also Proctor v. United Parcel Serv.*, 502 F.3d 1200, 1209 (10th Cir. 2007) (retaliatory motive can be inferred from short time period between protected activity and adverse employment action).  Informal as well as formal complaints or demands are protected activities.  *See Passantino v. Johnson & Johnson Consumer Prods., Inc.*, 212 F.3d 493, 506 (9th Cir. 2000) (Title VII retaliation case).

Mr. Mestas suffered several materially adverse employment actions in the three months following his return from protected medical leave.  On his first day back at work, Dale Brown informed him that he would be fired unless he signed a memo acknowledging his agreement to extend his at-will status.  In February of 2013, Mr. Mestas initiated a conversation with Supervisor Brown in an effort to address Brown's abusive treatment.  Brown's response was that if Mr. Mestas can't physically perform his job duties, he will be fired and that taking any more sick leave would confirm suspicions that Mr. Mestas is using his injury to avoid work, another justification to fire him.  He accused Mr. Mestas of arguing with him all the time when other employees instead observed that Brown 'beat up on Mr. Mestas pretty good,' was 'always on his case,' closely scrutinized Mr. Mestas's work, isolated him from co-employees, put him in situations where he could not succeed, and made him fear getting reinjured or sick.

This conduct was retaliation because it would not have occurred but for Mr. Mestas's participation in protected activity, namely taking medical leave for his injury.  Reyna, Adcock and Emond testified that Brown's hostile treatment intensified significantly after Mr. Mestas returned from medical leave.  Moreover, Brown's retaliatory behavior deterred Mr. Mestas from participating in any further protected EEO activity, such as filing an injury report, requesting an accommodation or additional medical leave for his recurring back pain.  Brown's conduct also deterred co-workers from complaining about the retaliation, for fear Brown would retaliate against them or they would lose their jobs.  Mr. Reyna testified that he believed he would be retaliated against for reporting this conduct and that Brown 'would turn on us.' Finally, only days after informing Brown that he would need an injection in his back, Mr. Mestas asked to use a snow blower because of his back pain.  Brown refused that request for some accommodation of his back injury.

Supervisor Brown's stated reasons for his dissatisfaction with Mr. Mestas's job performance included that he was lazy, unmotivated, slow, argumentative, would disappear from the job site, procured expensive items at the Town's expense without authorization,[9] had "issues" with co-employees and had anti-social tendencies.  These proffered reasons are pretextual and unworthy of belief.  *Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1178.  For purposes of summary judgment, Brown's assertions about Mr. Mestas's alleged poor job performance are disputed by Mr. Mestas and his co-workers, all of whom testified that Mr. Mestas was a team-player, worked hard, kept his truck clean and well-maintained, and that they got along just fine

---

[9]Supervisor Brown testified that after he returned to work following his medical leave, Mr. Mestas made several expensive, unauthorized purchases that Mr. Brown would later have to "sign off on."  Brown Depo., p. 103.  Despite reviewing all receipts for items procured by Mr. Mestas during that time period, Brown was unable to identify any that represented expensive, unauthorized or unapproved purchases.  Brown Depo., pp. 72-99 and pp. 100-101.

with him and heard no complaints about his from other co-workers.  It was objectively obvious to those employees and to Mr. Mestas that Supervisor Brown was trying to drive him out of his job with retaliatory conduct.

Mr. Mestas's receipt of SSDI benefits as of April 16, 2013, does not conflict with his ADA retaliation claim, a claim that does not require a showing that Mr. Mestas was disabled or could perform the essential functions of his job.  Mr. Mestas was able to and did perform all essential functions of his job through April 15, 2013.  However, by April 16th, he could not shovel snow, which arguably is an essential function of his job even though other employees were excused from shoveling and mechanical snow removal options were available.  His SSDI benefit award has no bearing on either of his ADA claims because he was subjected to harassment, retaliation and adverse employment actions that pre-dated his inability to engage in substantial gainful activity as of April 16, 2013. In fact, he may have been able to continue in the workforce beyond April 16, 2017, if he had been accommodated by not having to shovel snow rather than driven by Brown to the point of a disabling back injury.

### III. Conclusion.

For the foregoing reasons, this Court should deny the Town's request for a summary judgment on all of the plaintiff's claims because reviewing the facts in the light most favorable to Mr. Mestas, there are significant disputed issues of material fact regarding the pervasiveness of the hostile work environment, the retaliation, and the adverse employment actions taken by Dale Brown.  The Town is therefore not entitled to judgment as a matter of law.

Respectfully submitted this 3rd day of November, 2017.

For Plaintiff Roy Mestas

By: s/Megan L. Hayes
Megan L. Hayes
Attorney at Law
910 Kearney Street
Laramie, WY  82070
(307) 760-6258
mlhayes@wyoming.com

Attorney for Roy Mestas

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing Plaintiff's Brief in Opposition to Town of Evansville's Motion for Summary Judgment was served via the Court's CM/ECF system this 3rd day of November, 2017, to all attorneys of record.

___s/Megan L. Hayes_____
Megan L. Hayes